## BENJ. BABB v. SAMUEL MOSBY et al.

CONTRACT. *Construction.* The executors of two deceased partners agreed with the surviving partner to take the assets and pay the debts, except a certain sum to be paid by the surviving partner. They were all subsequently sued and held liable to the original holder of a debt which had in fact been paid out of the assets of the firm to an en-

Babb v. Mosby.

dorser, who had taken it up from the holder, by compelling him to take Confederate money for it. The surviving partner knew the manner in which the endorser had obtained the note, and had in fact aided him in forcing Confederate money on the holder. The executors did not know these facts, but believed the payment that had been made to the endorser to be valid. *Held:* 1. The executors were not bound under their agreement to pay the recovery in exoneration of the surviving partner. 2. But the debt not being provided for in the agreement, the partners should each pay one-third.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. R. J. MORGAN, Ch.

METCALF & WALKER for complainant.

ESTES & ELLETT for defendants.

McFARLAND, J., delivered the opinion of the court.

The firm of Harris, Hunt & Co., engaged in the cotton factorage and commission business at Memphis, was dissolved by the death of A. O. Harris in March, 1862, leaving the other two members of the firm, Thos. W. Hunt and Benjamin Babb, surviving. Hunt was at the time in declining health and unable to attend actively to the business, and so continued until he died, in December, 1862. Mary Harris, the widow and sole devisee of A. O. Harris, qualified as executrix of his will in November, 1862, and Judith P. Hunt, the widow of Thomas W. Hunt, and Samuel Mosby, qualified as executrix and executor of said Hunt's will in December, 1864. On the 22d March, 1865, said

representatives of Harris and Hunt joined in a bill in the chancery court at Memphis against said Babb, for a settlement of said partnership, in which bill various charges were made against him in relation to his conduct of surviving partner, not necessary to be now noticed. On the 5th of September, 1865, a written agreement was entered into between the parties, the material parts of which are as follows: Babb agreed to pay to the Union Bank of Tennessee at Memphis, $11,000, as his portion of the indebtedness of the firm of Harris, Hunt & Co. to said bank, supposed to be $45,000; and also to pay to the firm of Pickett, Wormley & Co. one-third of a note of $1,500, held by them on Harris, Hunt & Co.; and further, to relinquish his entire interest and rights of every character as surviving partner of the firm, and allow the use of his name in the collection of said assets. In consideration of all which the parties of the second and third parts, to-wit, the representatives of Harris and Hunt respectively, agreed " *to assume the payment of the balance of the debts of Harris, Hunt & Co. of every character to third parties; and agree and bind themselves, in their representative character, to save said Babb harmless from the payment of said debts.*" They further agreed to release Babb from all claim for profits made by him out of the assets since the death of his partners, and to dismiss their bill, before referred to, in which this claim was made. Said agreement was to constitute a full settlement of the business of said firm, whenever Babb paid the amounts assumed by him.

The present bill was filed by Babb on the 5th of December, 1870, to enforce the above agreement. He alleges that he has performed his part of the agreement, but that the defendants have failed to pay the other debts of the firm. Three debts are mentioned, but only one is now in controversy, to-wit, a debt due to the estate of Wm. Proudfit. The bill shows that soon after the date of the above agreement, a bill was filed against complainant as well as defendants and others, by the executrix of Wm. Proudfit, to recover said debt, and said cause resulted in a decree in favor of the complainant therein, establishing said debt against the firm; that defendants failed and refused to pay the decree, and complainant was himself compelled to pay the larger part of it, and now prosecutes the present bill for reimbursement upon the footing of the above contract.

The history of said debt is as follows: A note for $5,250, made by Harris, Hunt & Co. and endorsed by Pickett, Wormley & Co., was held by Wm. Proudfit. Said note fell due and was protested for non-payment about the last of May, 1862. On the 3d of June, 1862, three days before the city of Memphis (where these transactions all occurred) was occupied by the Federal forces, Wm. S. Pickett, of the firm of Pickett, Wormley & Co., accompanied by the present complainant, Benj. Babb, called on said Proudfit and compelled him to receive Confederate money in payment of the note, under the penalty of an immediate arrest by the Confederate military. The Confederate money paid belonged to the firm of Pickett, Wormley & Co., and

the understanding between Pickett and Babb was, that Pickett's firm was to hold the note for future settlement against the firm of Harris, Hunt & Co. It will be observed that the transaction occurred after the death of Harris and before the qualification of his executrix. Hunt was at the time alive, but not actively engaged in business, and did not participate in the transaction. Pickett was subsequently authorized by Babb, with the consent of the other parties, to act as agent for collecting debts due the firm of Harris, Hunt & Co. He was probably, in the first instance, selected by Mrs. Harris, to whose private business he was also attending, and in the year 1863 attended to some business of the firm in Boston. In March, 1864, he collected a debt of some $10,000 due to the firm of Harris, Hunt & Co. from parties in New Orleans. It does not clearly appear that in this transaction he was acting under any special authority; it was, however, under either the express or implied authority of Babb, and no doubt with the assent of Mrs. Harris. The representatives of Hunt had not then been qualified.

Out of the money thus collected (which was in par funds) Pickett retained the amount of the Proudfit note and interest, and made an entry in the books of Harris, Hunt & Co., then in his possession, showing the payment to himself, on behalf of his firm, of said note, and he says in his deposition that he thinks he left the note among the papers of Harris, Hunt & Co.

This was the condition of the claim when the agree-

ment of the 5th of September, 1865, was entered into. As we have seen, soon after, to-wit, on the 25th of September, 1865, the bill of Eliza Proudfit, executrix of Wm. Proudfit, was filed. It sets forth the circumstances under which Wm. Proudfit had been compelled to accept the Confederate money in payment of said note, and the prayer of the bill was to recover the amount of the note and interest. We do not regard it as material to set out with particularity the manner of the final disposition of the cause, except that the claim was established and the firm held liable. After the decree in the chancery court, the representatives of Harris and Hunt procured an order suspending the decree as to them. Babb also procured an order suspending the decree as to himself for a time, but a final decree was rendered against him, and an appeal was prosecuted by him to this court, Pickett having previously appealed. The cause was heard upon the appeal of Pickett and Babb, and the makers and endorsers of the note held liable (the endorsers secondarily), leaving them, however, to settle the equities between themselves in some other proceeding. Although it does not appear that any final disposition of the cause was made by the chancery court as to the representatives of Harris and Hunt, yet the final decree as to Babb established his liability of one of the firm, and he has been compelled to pay the decree, except about $2,200 paid by Pickett.

It is claimed on behalf of Babb that his present demand is not only within the letter but within the spirit of the agreement of the 5th of September, 1865.

The defendants having by that agreement bound themselves to pay all the debts of Harris, Hunt & Co. to third parties, except the amounts assumed and paid by Babb, and the claim of Proudfit having been established as a debt of said firm to a third party, it therefore falls within the very terms of the agreement.

It is in the first place argued in behalf of the defendants, that the recovery in the case of Mrs. Proudfit did not establish a debt against the firm of Harris, Hunt & Co., but was a recovery for the fraud or tort of Babb in forcing Wm. Proudfit to receive Confederate money, and was therefore not covered by the agreement. We agree, however, with complainant's counsel that the result of that cause was to establish the claim *as a debt* against the firm. The duress under which Proudfit accepted the Confederate money, avoided the payment and left the note in full force and unpaid. This was the theory of the case sustained by the court in its final decree.

But the real question in this case is, whether the present demand falls within the true spirit and meaning of the agreement. No effort has been made for a rescission, and none probably can be, as the agreement has been so far acted upon as to render it difficult if not impossible to place the parties in *statu quo;* it must, therefore, be enforced.

As we have seen, at the time the agreement was entered into, the 5th of September, 1865, the books of Harris, Hunt & Co. showed that this debt had been paid to Wm. S. Pickett, of the firm of Pickett,

Wormley & Co.; not only did the books show this, but it is not now denied, that such was the fact. That Pickett actually received the amount in par funds out of the assets of Harris, Hunt & Co. is admitted. That Pickett was the actual holder of the note is also admitted, and this was no doubt well understood by the parties. Hence it is argued that in agreeing to pay all the other debts of Harris, Hunt & Co., except the amounts assumed by Babb, the defendants not only did not contemplate the payment of this debt, but on the contrary it was in their negotiations regarded as paid, and therefore excluded from the agreement. The general terms of this agreement are sufficiently broad to include debts not then in the actual contemplation of the parties, such for instance as might have been overlooked or forgotten; it might also include demands of a contingent or uncertain character, where the firm was not believed in fact to be liable. In general, such an agreement would be construed as undertaking to take the risk as to all contested or contingent demands, where there is nothing to show a contrary intention. But the circumstances may be such as to show that the particular debt *was* in the contemplation of the parties, and although within the letter, yet in fact intended to be excluded from the agreement.

This may be illustrated by a case relied upon by the counsel upon both sides—the case of *Hart* v. *Messerger*, tried before the supreme court of New York, reported in 2 Sankey, 446, and afterwards before the court of errors and appeals, and reported in 46 New York, 253. Hart & Antis were the owners of a

private bank and became indebted to certain depositors, and to pay them off transferred them a note on one Shaffer. Hart afterwards bought out Autis, and then sold an interest to Messerger, and still later sold out the entire bank to him, taking from him a bond to indemnify him (Hart) against all claims against the bank. Subsequently the depositors sued Hart (he being personally liable), alleging that they had the right to recover the amount of their deposits, because the Shaffer note, transferred to them in payment of their deposits, turned out to be worthless. Their right to recover was based upon the ground either that they had accepted the Shaffer note as a payment only upon condition that it should be paid, or that they had been induced to accept said note upon the fraudulent representation of Hart that the maker was solvent, and having tendered back the note to Hart, they were in either event entitled to recover their deposits. Hart gave Messerger notice and he defended the suit, but there was judgment in favor of the depositors, which Hart paid, and thereupon sued Messerger upon his bond. The supreme court held that the recovery of the depositors against Hart was for his *fraud*, and this was not within the terms of Messerger's bond; but the court of appeals held that the recovery was upon the deposit, as unpaid, either because the Shaffer note had only been received as a conditional payment, or if received as an absolute payment, Hart's fraud in representing the solvency of the maker gave the depositors the right to rescind the agreement, and they having tendered back the Shaffer note, had the right

to recover the deposit, and therefore, *prima facie,* the recovery was within the terms of the agreement. The latter ruling was, in our opinion, the correct one. But the court further said, in substance, that if the books of the bank purported to contain a list of its liability to depositors, and showed that the depositors in question had been paid, Hart would be estopped from showing otherwise in the absence of explanatory evidence, and *prima facie* this defense would be good; and the question was, whether the additional evidence offered by Hart ought to have gone to the jury. The trial judge had non-suited the plaintiff after admitting part of his explanatory evidence and rejecting the remainder. The general term refused to set aside the non-suit. The additional evidence offered by Hart was, that the demand of the depositors to return the Shaffer note and have the amounts of their deposits paid to them, was made upon him in Messerger's presence and before Messerger's purchase of the bank; that he knew the nature of the claims and how they arose, and it was well understood that the claims existed when the plaintiff sold out to Messerger, and the matter was talked over before the bond was executed, and they talked of compromising the matter afterwards. It was held that this evidence ought to have been submitted to the jury, and the question left for them to determine whether, notwithstanding the books of the bank showed that the deposits were paid, that nevertheless the defendant knew of the existence of the demands and executed his bond in reference thereto. The reasoning seems to us sound.

The question in such cases is, what was in the minds of the parties at the time the agreement was made—what is the true meaning of the contract to be gathered from the language used, interpreted in the light of the surrounding circumstances as they then appeared to the parties? The agreement in this case was to pay all the debts of the firm of Harris, Hunt & Co., with the exceptions specified. The Proudfit note was known by all parties to have been in the hands of W. S. Pickett or Pickett, Wormley & Co.; it was further known that the amount of the note had been paid to Pickett out of the assets of Harris, Hunt & Co., and the note surrendered. The agreement of the 5th of September, 1865, was not executed in ignorance of the existence of said note, but looking to what must be supposed to have been in the minds of the parties, we must take it *prima facie* that all the parties regarded the note as paid, and therefore excluded from the terms of the agreement. But it would be entirely competent to show that the parties to the agreement, notwithstanding the books showed the debt paid, nevertheless knew that Proudfit still claimed the debt, or that there was a controversy in regard to it, or to show any facts that might establish that the parties executed the agreement with reference to this as an unpaid demand, or as a demand that might be made against the firm, and therefore might be brought within the terms of the agreement.

This brings us to a contested question of fact; that is to say, whether or not the defendants knew, at the time of the execution of the agreement of the

5th of September, 1865, of the existence of the Proudfit claim against the firm.   Did they know that the claim would probably be made, or did they have knowledge of the facts in relation to the manner in which Proudfit was compelled to accept the Confederate money ?   It is maintained for the complainant, that all the facts were known to the defendants.   The complainant himself testifies that when the agreement in question was executed, he spoke to the defendants of the probability of a suit by Proudfit, and expressed the opinion that if he sued he would recover.   The defendants deny this statement, and the complainant's testimony being unsupported, we must take it that the *fact* is not proven.

Upon consideration of all the testimony, we are not satisfied that the defendants had full knowledge of the facts that avoided the payment made by Pickett and the complainant to Proudfit.   Whatever knowledge may have been communicated to them at the time, if any, was communicated to them by the complainant. They deny that he informed them of the facts; he does not testify very positively that he did so with any particularity.   If he made any statements to them upon the subject, he doubtless gave them his version of the affair, which he evidently did not regard in the same light as the other witnesses;   for in his bill in this case he denies any active participation in the affair ·himself, and says even Pickett's acts have been greatly exaggerated.   The strongest testimony to show knowledge upon the part of any of the defendants, is the testimony of Wm. P. Proudfit, the son of Wm.

Proudfit, who witnessed the payment of the Confederate money, and who says he told Mrs. Harris, who was his mother-in-law, of the "*fuss*" he had had with Pickett and Babb; but even this, under all the circumstances, we think is not sufficient.

So we conclude, that in the execution of the agreement of the 5th of September, the parties assumed the facts in relation to the Proudfit claim to be as shown by the books. It was treated as paid and satisfied and the note surrendered, and they had no knowledge or belief that it was not in fact paid. Such, we think, was the attitude of the defendants, and as the complainant did not inform them of the facts within his knowledge, he is now estopped. The result is, we are not prepared to hold that by the agreement in question the defendants undertook to indemnify the complainant against the Proudfit claim. It is not, as argued in behalf of complainant, incumbent on the defendants to show that they would not have executed the agreement if the facts had been known to them. This would be so if defendants were seeking to rescind the contract on this ground. They stand upon the contract and claim only that by a fair construction, in the light of the facts as they then appeared to the parties, this debt was excluded from the agreement.

It is next argued on behalf of the complainant, that if not entitled to the relief upon the contract, he is entitled to have an account of the partnership effects and the debt thus paid. As neither party has sought a rescission, the contract cannot be set aside,

and without setting it aside this relief cannot be granted. We will not undertake to say what would be the equity of the parties if the agreement was out of the way. It is argued that the complainant, by the compromise, assumed to pay largely more than he would otherwise have been liable to pay; but we must take it that the considerations respectively moving between the parties was satisfactory to them, and therefore all this need not be enquired into.

*Lastly,* it is argued that if the debt in question be regarded as not within the contract, it should be treated as a matter not provided for; and as a debt of the firm unprovided for, the parties should each pay one-third, that being their liability as partners. This is the equity of the case, unless, upon the facts the complainant, as between the parties, should be held liable for the loss to the firm resulting from the wrongful payment to Pickett. We are of opinion that the weight of the proof shows that while the complainant was not as active as Pickett in forcing Proudfit to accept the Confederate money, yet he was present, ready to aid and abet, and therefore chargeable with the money; but it does not appear that he was attempting to take any personal advantage to himself out of the transaction. He seems to have acted from what he supposed to be the interests of his firm. The payment to Proudfit was in Confederate money belonging to Pickett, Wormley & Co., and the note taken up for their benefit; it was in law, therefore, their act. The subsequent transaction by which Pickett was allowed to retain the amount of the Proudfit note

out of the money of Harris, Hunt & Co., occurred while Babb was surviving partner, with the right to control the assets, yet he was not alone responsible for allowing Pickett to receive the money ; the others knew of and acquiesced in his employment, at least Mrs. Harris did so.

It is admitted on all hands that this liability should have been paid by Pickett; the money is wrongfully in his hands, and the loss has occurred to the other parties by their failure to pursue their remedies against him while he was solvent.    All parties knew of Mrs. Proudfit's claim upon the filing of her bill, 25th of September, 1865, and Pickett was then probably solvent. Even assuming that in legal contemplation—the complainant being then the surviving partner—the payment to Pickett should be regarded as his act, yet it would be a hard measure of justice to hold a surviving partner liable for an erroneous payment made under a mistake of legal rights, when there was no fraudulent purpose to make profit for himself, especially when in this case the other parties acquired knowledge of the facts in time to have pursued their remedy against Pickett, so as to have corrected the error.

The test of the question would be whether, independent of the compromise agreement, or upon the supposition that no such agreement had been made, the complainant would be held liable to the other partners for the amount wrongfully paid to Pickett, as for a wrongful and fraudulent appropriation of the partnership effects.    While we are of opinion that the complainant assisted Pickett in wrongfully obtaining the note,

and the payment subsequently made to him was no discharge of the debt, yet as between the partners it was not such a wrongful and fraudulent misappropriation of the partnership effects as to make complainant liable to the other partners therefor.

Under all the circumstances, therefore, we are of opinion that the complainant ought not to be denied this measure of relief. All parties were equally bound for this debt; upon our construction of the agreement of the 5th of September, 1865, the defendants did not assume to pay it; the result is it was left unprovided for, and the parties must bear their proportion of it. The complainant will, therefore, be entitled to a decree against each of the defendants for one-third of the amount paid by him, with interest. The amount is shown by the record. The costs of both courts will be paid one-half by complainant and the residuary half by the defendants.

Decree reversed accordingly.